**Blake PIRTLE, Petitioner,**

v.

**John LAMBERT, Respondent.**

**No. CT–98–5028–JLQ.**

United States District Court,
E.D. Washington.

June 26, 2001.

See also, 136 Wash.2d 467, 965 P.2d 593.

James Elliott Lobsenz, Carney, Badley, Smith & Spellman, Todd Maybrown, Allen, Hansen & Maybrown, Seattle, WA, for petitioner.

Paul Douglas Weisser, Donna H. Mullen, Attorney General of Washington, Criminal Justice Division, Olympia, WA, Dawn C. Cortez, Attorney General of Washington, Spokane, WA, for respondent.

John Lambert, Superintendent, Washington State Penitentiary, Walla Walla, WA, pro se.

MEMORANDUM OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS CONCERNING PENALTY ONLY

QUACKENBUSH, Senior District Judge.

**Before the Court** is the one remaining claim in Petitioner's Petition for Writ of Habeas Corpus. Todd Maybrown and James Lobsenz represent Petitioner. Paul Weisser and Donna Mullen represent Respondent. Having reviewed the entire record, and being fully advised in this matter, **It Is Hereby Ordered** that Petitioner's Petition for Writ of Habeas Corpus is **Conditionally Granted Concerning Penalty Only** for the following reasons.

## I. Factual and Procedural Background

On June 25, 1993 a jury convicted Pirtle of two counts of first degree murder with aggravating circumstances. A special sentencing hearing was then held, after which the jury had the responsibility to exercise the difficult moral judgment in determining whether Pirtle should receive the death penalty. The jury unanimously answered the special sentencing question yes, and on July 18, 1993, Pirtle was sentenced to be executed. Pirtle's conviction and sentence were affirmed by the Washington Supreme Court on October 12, 1995, which denied Pirtle's Motion for Reconsideration on January 19, 1996. The Washington Supreme Court denied Pirtle's Personal Restraint Petition and his Motion for Reconsideration of that decision was denied on December 7, 1998.

On May 5, 1999, Petitioner filed his First Amended Petition for Writ of Habeas Corpus in this court and thereafter the State supplied the court with the State court record of Pirtle's trial. On November 24, 1999, this court entered a Memorandum Opinion dismissing Petitioner's Petition based on claims 5, 9, 10, 11, 12, 13, 14, 15, 16, and 17 and reserved ruling on Petitioner's claims 1, 2, 3, 4, 6, 7, and 8. (Ct. Rec. 41). Supplemental briefs were filed and reviewed by the court.

On August 10, 2000, the court entered an Order granting in part Petitioner's Motion for Leave to Conduct Discovery only as to his claims arising out of the introduction into evidence of the non-Mirandized "you might as well shoot me now" statement in both the guilt and penalty phases of Petitioner's trial. (Ct. Rec. 47). The court found none of the other claims in Petitioner's Petition had merit. A telephonic conference was held on October 9, 2000 and counsel for Petitioner were directed to notify the court when discovery was completed and indicate whether they

felt the need for an evidentiary hearing. Counsel did so. Following discovery on the "shoot me now" claim, counsel filed further briefs and Petitioner moved to expand the record. On March 5, 2001, the court granted the motion to expand the record, rejecting Respondent's argument that an evidentiary hearing was necessary before the record could be expanded, finding that any need for an evidentiary hearing had been obviated by the completion of discovery. (Ct. Rec. 68). Respondent then supplemented the expanded record with cross designations of depositions which had been taken during discovery. (Ct. Rec. 68). The briefing concluded on April 2, 2001. The court has now reviewed the entire expanded record.

The factual background of this case has been described in detail in previous Opinions of this court, narrowing Petitioner's Petition for Writ of Habeas Corpus down to basically one claim, and those facts need not be repeated here. The only facts necessary to set forth herein are those surrounding Pirtle's arrest on May 17, 1992, when, without any advisement of rights and while in police custody, Pirtle was asked if he knew why he was under arrest, to which he answered "Of course I do, you might as well shoot me now". This challenged "shoot me now" statement was not disclosed to counsel for the Defendant, despite the trial court's Pretrial Order requiring disclosure of all admissions or statements of the Defendant. This "shoot me now" statement was introduced into evidence and argued by the prosecution in both the guilt and penalty phases of the trial. The treatment of the "shoot me now" issue by Pirtle's counsel, the prosecution, and by the Washington Supreme Court is the issue now before the court. The following relevant facts are not in dispute.

On May 17, 1992, following the brutal murder of two young employees of a Burg-er King Restaurant in Spokane, Washington, members of the Spokane County Sheriff's Department learned that the chief suspect Petitioner Blake Pirtle was staying in a motel room in the Trade Winds Motel in Spokane along with a woman.

Detective Patrick Bunch, Deputy Sheriff Cal Walker, and Sgt. Ron Ethridge were stationed on the third floor of the motel directly across the hall from Pirtle's room. The officers were not in uniform, but were carrying guns. When Pirtle exited his room and stepped into the hall, all three officers exited their motel room with their guns drawn and pointed at Pirtle, and loudly yelling that they were police and that Pirtle was under arrest. Deputy Walker tackled Pirtle, and forced him face down on the floor, holding a knee to Pirtle's back and placed handcuffs on Pirtle. Detective Bunch was "kneeled on the ground basically in front of Pirtle at his waistline and controlling the middle part of his body", and had a gun pointed at Pirtle's torso, while Sgt. Ethridge kept his gun pointed at Pirtle's head and told Pirtle that if Pirtle did not cooperate, Sgt. Ethridge would blow him away. "I remember I had my gun drawn and I was standing to the left side of Pirtle and Deputy Walker, and I had my gun pointed down at Blake Pirtle's head." *Deposition of James Ronald Ethridge*, (Ct. Rec. 74, ex. 2, p. 9) "So when we take down someone with guns and you are saying you are going to blow their head off if they don't cooperate, they don't always know you are the police." *Id.* at p. 12.

Q. So when you say "takedown," do you mean physically taken down to the floor?

A. Absolutely physically, yeah.

Q. Who took him down to the floor?

A. Again, I think it was Deputy Walker. They both could have been acting in

unison, Bunch and Walker, but I think it was Walker who had spun him.

Q. And did they take him face down to the floor?

A. Yes, sir.

Q. And was Pirtle on his stomach or his knees or what?

A. Stomach.

Q. And where was Walker when Pirtle went down to his stomach?

A. I recalled that he was off to Pirtle's left side. I think he had—Walker had his right knee in the small of Pirtle's back, and I remember him cranking on his left arm pulling the arm back. This is what I think I remember.

Q. Did Pirtle resist in any way?

A. No. He didn't fight or scream or holler. He hadn't said anything.....

Q. And who was the one who handcuffed him?

A. Truly, it could have been either of the two ...

Q. When they were handcuffing him, what were you doing?

A. I was standing above Pirtle, had my gun pointed at his head.

. . .

Q. ... did any of the three officers that were in that room announce that they were police as they came on to Pirtle?

A. I am sure we were all screaming it.

. . .

Q. And how about "you are under arrest", did anyone say that?

A. Yes, I think. I think both of those two guys did, Bunch and Walker.

Q. Loud enough for you to hear?

A. I think you probably heard it all the way down the hall of the hotel.

. . .

Q. While Pirtle was on the floor in that hallway did anybody read him his *Miranda* rights.

A. On the floor? No, sir.

. . .

Q. Is it your memory that both Cal Walker and Pete Bunch had their hands on Pirtle when he made the statement?

A. Yes, sir.

Q. And when he made the statement, you would have been pointing the gun towards Pirtle's head?

A. Yes, sir.

Q. You said something earlier in answering one question to the effect that "if you don't cooperate, I am going to blow you away," or words to that effect. Do you recall saying that?

A. Today?

Q. Yes.

A. Yes, sir.

Q. Is that the type of statement that you would make during the arrest process?

A. Virtually all the time. It is shock value. We just do it for the shock.

*Id.* at 322–35.

Two other law enforcement officers, Detective Madsen and Detective Knechtel, also in plain clothes and carrying guns, came up to the third floor from the second floor with their guns drawn. By this time, Pirtle was flat on his stomach, with Deputy Bunch holding his midsection and holding a gun to Pirtle's torso. Deputy Walker's knee was in Pirtle's back, Sgt. Ethridge's gun pointed at Pirtle's head. No *Miranda* warnings were given. Deputy Walker first asked if Pirtle knew he was under arrest. Pirtle replied "yes". Deputy Walker then asked Pirtle if he knew why he was under arrest. Pirtle replied "Of course I do, you might as well shoot me now." The foregoing facts are undisputed.

None of the arresting officers included Pirtle's "Shoot me now" statement or the coercive surrounding circumstances in their police reports. Pirtle's trial attorneys did not interview the arresting offi-

cers to ask if Pirtle had made any statements at the time of his arrest. The statement was never revealed to anyone and no voluntariness or *Miranda* hearing was ever held concerning the statement.

During the guilt phase of Pirtle's trial, Deputy Walker was called as a rebuttal witness to testify as to Pirtle's appearance at the time of his arrest. Deputy Walker testified:

At the time that I took Pirtle to the floor and pulled his hands around from underneath him and to the back, he didn't resist at all and brought his hands behind him, placed handcuffs on him and told him at that time who I was. I asked him if he knew he was under arrest, and while he was laying on his stomach in the hallway, I slightly rolled him up to start searching him. I started with the left side of him, and he looked back at me smiled and indicated that he knew he was under arrest. I asked him if he knew why, and he stated 'Of course I do, you might as well shoot me now.'

*State Court Record,* Vol. 5, p. 2607.

Defense counsel did not object and did not cross-examine Deputy Walker. As previously noted, Pirtle had not been advised of his *Miranda* rights before the question "Do you know why you are under arrest" was asked, and no voluntariness hearing concerning the statement "Of course I do, you might as well shoot me now" had been held. During the State's final closing argument in the guilt phase, the prosecutor argued that Pirtle's statement to Walker was evidence that Pirtle was not having a brain seizure at the time of the murders because if he were, he would have gone into a seizure when he was jumped and brought to the ground by police officers.

What would be more startling in a stressful moment than being arrested with a bunch of police jumping on you? And he had admittedly been using a large quantity of drugs with Karen Roseboom that afternoon. No resistance, nothing. Just lookin' up with an eerie smile, says, Yeah, I know what I did. You might as well shoot me right now. That does not indicate an amnesiatic psychotic episode, psychosis. That indicates an individual who knew exactly what he had done.

*State Court Record,* Vol. 5, pp. 2786–2787.

Again, no objection was made.

Following Pirtle's conviction of two counts of first degree murder with aggravating circumstances, a special sentencing proceeding was held. During this penalty hearing, which required the jury to consider whether or not to impose the death penalty the prosecutor argued to the jury "Remorse? Smiling? You might as well shoot me now? Do you think he thought that police officer was going to shoot him?" *State Record* Vol. 5 p. 3016. Once again, defense counsel did not object, and the "shoot me now" statement was before the jury through the testimony and argument of the prosecution while the jury deliberated on the moral judgment of whether to impose the death penalty. Washington law prevents the imposition of the death penalty if even one juror opposes its imposition. *See p.* 1097, *infra,* and *Mak v. Blodgett,* 970 F.2d 614, 621 (9th Cir.1992). The jury answered yes to the special sentencing issue of whether to apply the death penalty. Pirtle was sentenced to death on July 18, 1993.

Pirtle appealed his conviction and sentence directly to the Washington Supreme Court, which affirmed the conviction and sentence. *State v. Pirtle,* 127 Wash.2d 628, 904 P.2d 245 (1995). A petition for *writ of certiorari* was denied by the United States Supreme Court. *Pirtle v. Washington,* 518 U.S. 1026, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996).

The issue of the "you might as well shoot me now" statement was first raised in Pirtle's Washington State Personal Restraint Petition, which raised fourteen (14) different claims in all. Pirtle claimed, inter alia, that (1) it was prosecutorial error to not disclose to the defense Pirtle's "you might as well shoot me now" statement in violation of Washington discovery rules and in violation of Pirtle's due process rights; (2) it violated Pirtle's due process rights to introduce a previously undisclosed, involuntary, and non *Miranda* statement without holding a voluntariness hearing or evaluation of the prejudicial impact of the statement; and (3) Pirtle received ineffective assistance of counsel in handling Deputy Walker's testimony during trial, as well as ineffective assistance of counsel on appeal for not raising any issue concerning the statement. Counsel also moved for discovery and an evidentiary hearing. On October 1, 1998, the Washington Supreme Court denied the Personal Restraint Petition and denied the motions for discovery and evidentiary hearing. *In the Matter of the Personal Restraint Petition of Blake Pirtle,* 136 Wash.2d 467, 965 P.2d 593 (1998).

The Washington Supreme Court held that the State did not violate Washington discovery rules and it was not a violation of Pirtle's due process rights to not disclose Pirtle's statement to the defense, or to fail to hold a voluntariness hearing because "Pirtle ignores the fact that the State had no knowledge Deputy Walker would mention this previously unknown statement in his testimony." The Court further held that Pirtle was not being interrogated, rather that Deputy Walker was only asking background booking questions, where "*Miranda* warnings are not applicable." Finally, the Court held that Pirtle had not received ineffective assistance of counsel at trial because there was no evidence that interviewing Deputy Walker would have triggered his memory,

the failure to impeach Walker did not violate Pirtle's rights because that failure did not fall below Sixth Amendment standards, and that his claim that the assistance of his appellate counsel was ineffective must fail because "[s]ince we find no error in Deputy Walker's testimony, under any approach, Pirtle's argument fails."

Pirtle's Petition for Writ of Habeas Corpus was timely filed in this court on May 5, 1999, after the effective date of the Anti–Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. section 2254(d)(1) ·effective April 24, 1996. All of Pirtle's claims in his Petition for Writ of Habeas Corpus other than those concerning the "you might as well shoot me now" statement have previously been dismissed, and the court has allowed and considered discovery surrounding the "you might as well shoot me now" statement, bringing to light for the first time the coercive circumstances that existed at the time Pirtle made the "you might as well shoot me now" statement. The Petitioner's earlier request for an evidentiary hearing was withdrawn.

## II. The AEDPA Standard of Review

■ It cannot be disputed that in passing the AEDPA, Congress rendered it more difficult for prisoners in general, and particularly capital defendants to receive collateral relief by way of habeas corpus. However, the existence of new statutory restrictions does not mean that federal habeas review has been eliminated, even for capital defendants. Nothing in the AEDPA requires federal courts to turn a blind eye to State proceedings or to rubberstamp them. Rather the application of AEDPA simply requires a more refined approach in considering a petition for writ of habeas corpus.

Under 28 U.S.C. section 2254(d)(1), this court may reverse a decision of the Wash-

ington Supreme Court denying Pirtle relief only if that decision is (1) "contrary to" or "involves an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States" or (2) was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. Section 2254(d)(1)(2); *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■■■ As explained in Justice O'Conner's opinion for the Court in *Williams*, *supra*, a State court acts contrary to clearly established federal law if it applies a legal rule that contradicts prior Supreme Court holdings or if it reaches a different result from a Supreme Court case despite confronting indistinguishable facts. The statute also authorizes federal habeas corpus relief if, under clearly established federal law, a State court has been unreasonable in applying the governing legal principle to the facts of the case. "A state determination may be set aside under this standard if, under clearly established federal law, the State court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 164, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000). A State court's decision can involve an "unreasonable application" of controlling law if it either (1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams, supra* at 362, 120 S.Ct. 1495.

■■■ The Supreme Court need not have addressed a factually identical case. Rather it is only required that the Supreme Court clearly determined the law. *Hous-*ton v. Roe, 177 F.3d 901, 906 (9th Cir. 1999), *cert. denied,* 528 U.S. 1159, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000).

■■■ State court judgments "must be upheld unless, after the closest examination of the State-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." *Williams, supra* at 387, 120 S.Ct. 1495. Simply stated, a federal court should not issue the habeas writ unless the State court was wrong as a matter of clearly established Supreme Court law or was unreasonable in its application of clearly established Supreme Court law to the facts of a particular case.

Pirtle claims he was denied his constitutionally guaranteed rights to due process and right against self-incrimination concerning the admission of Pirtle's "shoot me now" answer to the question posed by Deputy Cal Walker at the time of Pirtle's arrest, while Pirtle was in custody without having been given any warnings as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and without having been given a voluntariness hearing as required by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Pirtle also claims he was denied his right to effective representation under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) because his trial counsel neither conducted discovery to learn of the statement nor cross-examined Deputy Walker about the statement, and his appellate counsel did not raise any issue concerning the "you might as well shoot me now" statement on direct appeal.

The initial inquiry under the AEDPA is whether Pirtle seeks to apply rules of law that were clearly established at the time his State-court conviction became final. Pirtle's State-court conviction became final on December 29, 1998, when the Washing-

ton Supreme Court issued its Certificate of Finality. This question is easily answered because the merits of Pirtle's claim are governed by clearly established Supreme Court holdings that pre-dated Pirtle's final conviction. Therefore, the inquiry becomes whether the Washington State Supreme Court decisions as to Pirtle's constitutional claims either were contrary to a clearly established Supreme Court ruling or unreasonably failed to apply a clearly established Supreme Court holding to the facts of this case. This court is firmly convinced that the Washington State Supreme Court' decisions that Pirtle's Due process, Fifth Amendment, and Sixth Amendment rights were not violated were either contrary to or an unreasonable application of clearly established federal law as held by the United States Supreme Court.

### 1. Failure to Advise Pirtle of Miranda Rights

█ It is not disputed that at the time of Pirtle's arrest, three law enforcement officers were yelling at him, and while he was being held face down on the ground and handcuffed, with a law enforcement officer's knee in his back, a police officer with a gun to his torso, and another law enforcement officer holding a gun to his head and threatening to blow Pirtle away if he did not cooperate, Deputy Cal Walker asked Pirtle if he knew why he was under arrest. Pirtle answered, "Of course I do, you might as well shoot me now." It is also undisputed that Pirtle had not been advised of his *Miranda* rights at this time. Neither is it disputed that no voluntariness hearing was ever held or that this "shoot me now" statement was not disclosed to anyone, until testified to by Deputy Walker, nor is it disputed that the testimony concerning the custodial statement was unchallenged by the defense attorney at trial, was argued to the jury in both the guilt

and penalty phases, and that the issue was not raised on direct appeal.

The law governing the admission of confessions first developed in the common law in first the courts of England and then early decisions of the United States Supreme Court which recognized that coerced confessions are inherently untrustworthy. *See e.g. King v. Rudd,* 1 Leach 115, 117–118, 122–123, 168 Eng. Rep. 160, 161, 164 (K.B.1783) (Lord Mansfield, C.J.) (Stating that the English courts excluded confessions obtained by threats and promises); *King v. Warickshall,* 1 Leach 262, 263–264, 168 Eng. Rep. 234, 235 (K.B.1783) ("A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt ... but a confession forced from the mind by the flattery of hope or by the torture of fear, comes in so questionable a shape ... that no credit ought to be given to it; and therefore it is rejected.") *See also Hopt v. Territory of Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884); *Pierce v. United States,* 160 U.S. 355, 16 S.Ct. 321, 40 L.Ed. 454 (1896).

Over time, the United States Supreme Court recognized two constitutional bases for the requirement that a confession must be voluntary in order to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fifth and Fourteenth Amendment. *Dickerson v. United States,* 530 U.S. 428, 432, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

The Self–Incrimination Clause of the Fifth Amendment provides that no "person ... shall be compelled in any criminal case to be a witness against himself." In *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Court held that the Fifth Amendment's Self–Incrimination Clause is incorporated into the Due Pro-

cess Clause of the Fourteenth Amendment, and therefore applies to the States.

■ The privilege "protects an accused from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court reaffirmed its previous understanding that the privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from "informal compulsion exerted by law-enforcement officers during in-custody questioning", and that therefore, prior to any custodial questioning, a suspect must be provided with procedural safeguards before a suspect's statement made during custodial interrogation could be admitted into evidence. *Id.* at 479–481, 86 S.Ct. 1602. The Court noted that the advent of modern custodial police interrogation brought with it an increased concern about confessions obtained by coercion. Because custodial police interrogation, by its very nature, isolates and pressures the individual, the Court stated that "[e]ven without employing brutality, the 'third degree' or [other] specific stratagems, ... custodial interrogation exacts a heavy toll on individual liberty and trades on the weaknesses of individuals." *Id.* at 455, 86 S.Ct. 1602.

The Court in *Miranda* concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment ... not to be compelled to incriminate himself." *Id.* at 442, 86 S.Ct. 1602. Therefore, the Court established guidelines and held that the admis-

sibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police had provided the suspect with four procedural warnings, which have come to be known as the *Miranda* warnings.

■ Thus, under *Miranda*, any statement by a suspect, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant must be suppressed unless the police provide the four procedural safeguards to secure the privilege against self-incrimination.

■ Custodial interrogation means questioning initiated by law enforcement officers reasonably likely to elicit an incriminating response after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *Id.* at 443, 86 S.Ct. 1602. Thus, the question of whether *Miranda* warnings are necessary depends on (1) whether the defendant is in custody and if so (2) whether he has been subject to questioning by law enforcement officers reasonably likely to elicit an incriminating response.

■ In *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court held that *Miranda* is a constitutional based decision that even Congress may not supersede legislatively. *Id.* Therefore, *Miranda* requirements were not superseded by passage of the AEDPA.

Here, it is not disputed that Pirtle was in custody when Detective Walker asked "do you know why you are under arrest?", to which Pirtle answered "Of course I do, you might as well shoot me now." The only question is whether the Washington Supreme Court unreasonably determined that Deputy Walker was not interrogating Pirtle, but rather was just asking background booking questions. In so finding,

the Washington Supreme Court recognized the controlling authority of *Miranda* but found it did not apply to these facts citing only to three Washington decisions: *Washington v. Bradley*, 105 Wash.2d 898, 719 P.2d 546 (1986); *Washington v. Franklin*, 48 Wash.App. 61, 737 P.2d 1047 (1987); and *Washington v. Walton*, 64 Wash.App. 410, 824 P.2d 533 (1992). The Washington Supreme Court did not discuss or apply applicable decisions of the United States Supreme Court on "interrogation", discussed, *infra*. This court finds that the Washington Supreme Court erred and unreasonably failed to apply the holding in *Miranda* to the facts of this case. That Court also failed to consider applicable decisions of the United States Supreme Court.

In *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), the United States Supreme Court addressed the difference between routine booking questions, which are not subject to *Miranda*, and questions intended to elicit information for investigatory reasons, which are subject to *Miranda*. In *Muniz*, the defendant was arrested for driving under the influence of alcohol. Without giving any *Miranda* warnings, a police officer first asked the defendant questions concerning the defendant's name, address, height, weight, eye color, date of birth, and current age. The Court found that these questions were admissible without the protections of *Miranda* because they were routine booking questions requested for record keeping purposes only. However, the Court distinguished these questions from the final question in which the police officer asked the defendant if he knew the date of his sixth birthday. The Court found the defendant's response was testimonial and that *Miranda* required the answer to be suppressed.

> Whenever a suspect is asked for a response requiring him to communicate an express or implied assertion of fact or belief, the suspect confronts the 'trilemma' of truth, falsity, or silence, and hence the response (whether based on truth or falsity) contains a testimonial component.

*Id.* at 597, 110 S.Ct. 2638.

> When Officer Hosterman asked Muniz if he knew the date of his sixth birthday and Muniz, for whatever reason, could not remember or calculate that date, he was confronted with the trilemma. By hypothesis, the inherently coercive environment created by the custodial interrogation precluded the option of remaining silent.... Muniz was left with the choice of incriminating himself by admitting that he did not then know the date of his sixth birthday, or answering untruthfully by reporting a date that he did not believe was accurate....

*Id.* at 598–599, 110 S.Ct. 2638.

> The Commonwealth's protest that it had no investigatory interest in the actual date of Muniz's sixth birthday, ... is inapposite. The critical point is that the Commonwealth had an investigatory interest in Muniz's assertion of belief that was communicated by his answer to the question... The incriminating inference stems from the then-existing contents of Muniz's mind as evidenced by his assertion of his knowledge at that time.

*Id.* at 599, n. 13, 110 S.Ct. 2638. The *Muniz* case was not cited or discussed by the Washington Supreme Court.

Here, it is clear that when Deputy Walker asked Pirtle if he knew why he was under arrest the circumstances were not in a "booking setting". Walker had an investigatory interest in Pirtle's assertion of belief that he admitted and knew what he had done. Pirtle's belief that he deserved to die for his acts was clearly communicated by his answer to the question. The inherently coercive environment created by being held face and stomach down on

the ground with a gun pointed at his head and under a threat of being shot if he didn't cooperate, precluded the option of remaining silent leaving Pirtle with the choice of incriminating himself or answering untruthfully. He was not advised of his option of remaining silent.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), likewise not discussed by the Washington Court, the Supreme Court held that *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

> By 'Incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda:* 'No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions of part or all of an offense.' The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination.'

*Id.* at 299, 100 S.Ct. 1682. The State argues that the intent of the question "Do you know why you are under arrest" was not to elicit an incriminating response, but rather was just to ensure that Pirtle knew he was under arrest. However, the *Innis* inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 291, 100 S.Ct. 1682.

It is clear that Pirtle knew he was under arrest at the time the question was asked.

Pirtle had been thrown to the ground at gunpoint, with the officers yelling loudly that they were police and that he was under arrest. Pirtle was held there face down and handcuffed, one gun pointed at his torso, and another gun pointed at his head, and under a threat of being shot if he did not cooperate. Deputy Walker then asked Pirtle "Do you know why you are under arrest," to which Pirtle answered "Of course I do, you might as well shoot me now."

*Miranda* serves to guard against "the unreliable statements at trial." *Johnson v. New Jersey*, 384 U.S. 719, 730, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). The *Miranda* Court made it clear that the basis for its decision was the need to protect the fairness of the trial itself. *Withrow v. Williams*, 507 U.S. 680, 690, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993).

The Washington Supreme Court recognized that *Miranda* was controlling authority, but did not refer to any United States Supreme Court authority in finding that Pirtle was not the subject of interrogation, rather relying only on three Washington cases, the facts and conclusions of which do not support the Washington Supreme Court finding and conclusions in this case.

*Washington v. Bradley*, 105 Wash.2d 898, 719 P.2d 546 (1986) involved a border search, where the defendant was given *Miranda* warnings and invoked the right to have an attorney appointed. While an officer was filling out personal history forms, the defendant, without being asked any questions, stated "You sure are making a big deal out of a little bit of coke." The officer then asked the defendant about marijuana, and the defendant replied that "they had just finished their last joint before they pulled up to the border." The court found that the defendant's first statement about the coke was made volun-

tarily while the defendant was being questioned about his personal history, and was therefore admissible. However, the court found that the second statement was not admissible because it was made in response to the officer's question about marijuana.

In *Washington v. Franklin,* 48 Wash. App. 61, 737 P.2d 1047 (1987) the defendant, who had recently been taken into custody and advised of his *Miranda* rights, voluntarily approached a detective, who then asked the defendant if he understood what he had been charged with in Washington. The defendant said that "he was surprised to see that he was wanted for murder, and ... that this was not right, because he was guilty of robbery, but not murder, since he had not killed anyone." The defendant was given a voluntariness hearing concerning his statements and his statements were ruled admissible since they were **voluntarily made after he had been properly advised of his *Miranda* rights.**

In *Washington v. Walton,* 64 Wash.App. 410, 824 P.2d 533 (1992), the officer asked the defendant of his address prior to any *Miranda* warnings. The court found that routine information necessary for basic identification purposes is not interrogation. **"Only if the agent should have reasonably known the information sought was directly relevant to the offense will the request be subject to scrutiny."** *Id.* at 413, 824 P.2d 533. (Emphasis added).

Here the question asked by Deputy Walker of Pirtle had nothing to do with routine information, such as name, address, height, weight, age. Rather, the question was directly relevant to the offense, *i.e.* "Do you know why you are under arrest?" Like the situation in *Muniz,* supra, the State had an investigatory interest in Pirtle's assertion of belief that was communicated by his answer to the question that he knew why he was under arrest and should be shot for what he had done. The incriminating inference stems from the then-existing contents of Pirtle's mind as evidenced by the assertion of his knowledge at that time.

Therefore, this court finds that the Washington Supreme Court finding that no *Miranda* warnings were necessary, because Deputy Walker's question was allegedly a routine booking question, is directly contrary to controlling authority as determined by the United States Supreme Court in *Muniz,* and *Innis* supra. The court is further firmly convinced that the Washington Supreme Court decision that Pirtle's Fifth and Fourteenth Amendment rights were not violated by the admission of his statement without having been given the benefit of *Miranda* warnings unreasonably refused to extend the governing legal principle of *Miranda* to the facts of this case.

**2. Failure to Disclose Pirtle's Statement and Failure to Hold Voluntariness Hearing**

■ In addition to the fact that Pirtle's "shoot me now" statement was admitted into evidence, even though the statement came from a custodial interrogation without the benefit of any *Miranda* warnings, the police officers did not include any mention of the statement or surrounding coercive circumstances in any police report. This information was not disclosed to anyone prior to trial to allow for any kind of voluntariness hearing concerning the statement prior to it being admitted into evidence. The police officers have testified by deposition and/or affidavit that they did not consider the statement to be important enough to include in a police report. However, this claim is belied by the fact that obviously Deputy Walker found it important enough to testify about it at trial, and the prosecutor found it important enough to include it in argument both on guilt and the death penalty.

The Washington Supreme Court found that Pirtle's rights were not violated by the failure to disclose Pirtle's statement to the defense or the failure to hold a voluntariness hearing because the Court found that the State did not know of the statement. Again, this court finds that the Washington Supreme Court erred and unreasonably failed to apply clearly established United States Supreme Court precedent to the facts of this case.

■ Due Process imposes an obligation upon the prosecution to ensure that a Defendant receives a fair trial. Recognizing this to be the case, the United States Supreme Court has clearly held that knowledge of police officers is imputed to the prosecution.

"[I]t may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that "procedures and regulations can be established to carry the prosecutor's burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104.(1972)). [A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the Government's obligation to ensure fair trials." *Id.*

■ "Whether nondisclosure is a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." *United States v. Endicott,* 869 F.2d 452 (9th Cir.1989) (citing *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). "Since the investiga-

tive officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure. Indeed, it is the character of the evidence, not the character of the prosecutor, that determines whether nondisclosure constitutes constitutional error." *Id.* (citing *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

Here, the character of the evidence that was admitted, without any prior disclosure or *Miranda* warnings, was that of a coerced confession. However, the Washington Supreme Court did not recognize the clearly established holding in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) in finding that Pirtle's rights were not violated due to the lack of disclosure and lack of a voluntariness hearing.

The United States Supreme Court in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), held that a defendant's right to be free of conviction or imposition of the death penalty based on a coerced confession requires a State court hearing on the question of voluntariness of the confession, and that the failure to give a defendant such a hearing violates a defendant's due process rights under the Fourteenth Amendment.

The case of a confession induced by physical or mental coercion deserves special attention.... A fair consideration of the evidence upon the preliminary question is essential.; in this consideration the truth or untruth of the confession is immaterial ... Due process of law requires that a coerced confession be excluded from consideration by a jury. It also requires that the issue of coercion be tried by an unprejudiced trier...

*Id.* at 382, 84 S.Ct. 1774.

■ In addition to requiring procedural warnings before a defendant can be

subjected to custodial interrogation, *Miranda* refers to the "inherent pressures of the interrogation atmosphere." *Miranda, supra,* 384 U.S. at 468, 86 S.Ct. 1602. The purpose of the admonitions is to combat what the Court saw as "inherently compelling pressures at work on the person and to provide him with an awareness of the Fifth Amendment privilege and the consequences of foregoing it." *Id.* at 467, 86 S.Ct. 1602, "The purposes of the safeguards prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing." *Berkemer v. McCarty,* 468 U.S. 420, 433, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), "The relinquishment of the right protected by the *Miranda* warnings must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

"[T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). "Custody works to the State's advantage in obtaining incriminating information. The psychological pressures inherent in confinement increase the suspect's anxiety ..." *Illinois v. Perkins,* 496 U.S. 292, 304, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). One cannot imagine any more anxiety ridden situation, regardless of whether a person has committed an egregious offense, than being thrown and held on the ground with a gun pointed at one's head and a police officer threatening to "blow you away" if you don't cooperate.

This court finds that Pirtle's Due Process rights as well as his right against self-incrimination under the Fifth Amendment were violated and that his statement can-

not be classified as a voluntary statement, under the circumstances under which the statement was made. To find that a person's statement made while being held face down on the ground, with guns pointed at his head, and under a threat of death for not cooperating with the authorities was voluntary would clearly be contrary to controlling authority as determined by the United States Supreme Court. The uncontradicted facts lead to the inescapable conclusion that Pirtle's statement to Walker was not voluntarily made and the holding of the Washington Supreme Court that no disclosure of the confession or voluntariness hearing was required because the State did not know about the statement completely contradicts prior Supreme Court holdings, as discussed *supra.*

**3. Ineffective Assistance of Counsel**

■ Pirtle argued to the Washington Supreme Court that it was ineffective assistance of counsel for his trial counsel not to do any discovery concerning the custodial interrogation, and for failing to impeach Deputy Walker for failing to mention the statement in his police report and that it was also ineffective assistance of appellate counsel for not raising the issue on Pirtle's direct appeal. The Washington Supreme Court found that it was not ineffective assistance to forego any discovery concerning the statement because "there are no facts to support the argument that interviewing Deputy Walker would have triggered his memory and made Pirtle's counsel aware of this evidence." As to the failure to impeach claim, the Court stated "Any failure of Pirtle counsel to impeach Deputy Walker does not fall below Sixth Amendment standards," citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As for the claim that it was ineffective assistance to not raise the issue on direct appeal, the Court simply stated that "Since we find no

error in Deputy Walker's testimony, under any approach, Pirtle's argument fails."

■ I am firmly convinced that the Washington Supreme Court erred and failed to reasonably apply the holding of *Strickland* to the facts of this case. The Sixth Amendment right to the effective assistance of counsel "is fundamental and essential to fair trials." *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *See also Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

The applicable law which guides an examination of the effectiveness of counsel is supplied by *Strickland v. Washington, supra,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which, like *Miranda,* and *Jackson* is clearly established Federal law. Under *Strickland,* Pirtle must first show that his counsel's performance was deficient in a way that fell below an objective standard of reasonableness. *See Strickland* at 687–88, 104 S.Ct. 2052. Second, he must show he was prejudiced by the deficient performance to such an extent that the resulting proceedings were unreliable. *See Id.* at 687, 104 S.Ct. 2052. Applying that analysis, this court finds that the State court erred in concluding that Pirtle received effective assistance of counsel concerning the "you might as well shoot me now" statement within the meaning of *Strickland* and that error was objectively unreasonable.

■ Although there is a strong presumption that an attorney's conduct meets the standard for effectiveness, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 690, 104 S.Ct. 2052. Under "Strickland", in addition to showing that counsel's performance fell below an objective standard of reasonableness, a petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different," where a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

Here, at the time Pirtle was arrested, he was placed into custody in a very coercive environment, and was interrogated as to whether he knew why he was under arrest, without having received any warnings as required by *Miranda.* Neither Pirtle's statement nor the coercive circumstances surrounding the statement were ever revealed to anyone. Pirtle's trial counsel made no effort to interview the police officers about any statement Pirtle had made or the surrounding circumstances at the time of his arrest. Pirtle's answer to the custodial question was admitted into evidence, without any objection or cross-examination and argued by the prosecutor both during the guilt and death penalty phases of Pirtle's trial without any objection by Pirtle's counsel and without having had any voluntariness hearing concerning the statement. Additionally, appellate counsel for Pirtle failed to raise any issue concerning the "Why don't you shoot me now" statement on direct appeal. The court finds that this lack of diligence by both trial counsel and appellate counsel fell below an objective standard of reasonableness constituting deficient performance by counsel. Therefore the issue becomes whether Pirtle has established a reasonable probability sufficient to undermine confidence in the outcome of either the guilty verdicts or the death penalty imposed, but for counsel's errors.

As for the verdicts of guilty at the end of the guilt phase of Pirtle's trial, I cannot find a reasonably probability that but for Pirtle's counsel's deficiencies, and the admission of Pirtle's statement, the guilty result would have been any different. The evidence against Pirtle was extremely

strong during the trial, including his own testimony as to his commission of the murders, and how he tried to cover up the crimes he had committed. There was more than enough evidence, other than that of Pirtle's custodial statement, for a jury to find that Pirtle had a motive for the killings and that he premeditated the murders.

However, this court finds that the failure of counsel inquire about any statements, the failure to object to the testimony and argument concerning the non *Miranda* statement of Pirtle that "you might as well shoot me now" and the failure to raise on direct appeal the constitutional issues that this court has found to have merit establishes a probability sufficient to undermine the confidence in the jury's imposition of the death penalty following the penalty hearing as discussed below.

### 4. Harmless Error

 Trial evidentiary errors, including even the admission of non *Miranda* custodial involuntary statements that violate a person's Fifth and Fourteenth Amendment rights and the failure to effectively assist a defendant in violation of the Sixth Amendment are subject to collateral review under the harmless error standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), finding that collateral relief is only appropriate if "actual prejudice" resulted because a constitutional violation had substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

### A. The Guilt Phase

 As noted by the Washington Supreme Court, the evidence presented during the guilt phase of Pirtle's trial clearly established both premeditation and motive.

Pirtle, in addition to having motive for revenge for his termination from Burger King, chose to rob an establishment where he was well known and could be identified. Pirtle's actions that day . . . demonstrate premeditation.

Pirtle took Dawnya into the walk-in cooler where he struck her several times in the head with two paint cans, then after she was already unconscious and lying on the floor, he cut her throat. Both Pirtle's testimony and physical evidence show Dawnya resisted the attack.

Pirtle then talked Tod into leaving the freezer and walking to the office, telling Tod he only wanted to knock him out. He convinced Tod to take off his glasses and lie face down on the floor, whereupon he hit Tod twice with a fire extinguisher, then retrieved a knife and cut Tod's throat after he was unconscious. There were nine wounds to the front of Tod's neck and eight to the back of his neck, which could have been caused either by the knife or by a hacksaw found on Tod's body.

After killing Tod, Pirtle returned to the cooler and cut Dawnya's throat some more, as Pirtle testified, 'because her body was makin' noises.' He sawed at her throat with the knife at least sixteen times, nearly decapitating her. The examining physician speculated the hacksaw also may have been used on Dawnya's neck.

Following the murders, Pirtle had the presence of mind to change clothes, gather the robbery proceeds and some of the evidence into a garbage bag, bring his car to the rear of the Burger King, and load the full garbage bag into the car. He drove home, cleaned up the car and himself, and hid the evidence in a compost pile in a neighbor's yard.

*Pirtle, supra,* 127 Wash.2d at 645, 904 P.2d 245 (citation omitted).

Although Pirtle's statement to Deputy Walker should have been suppressed, the court finds the failure to do so was harmless beyond any doubt concerning the finding of guilt. Even without consideration of that statement to Walker, the evidence of Pirtle's guilt was overwhelming.

Therefore, this court cannot find that, despite the serious constitutional violations that occurred in this case, those violations had substantial and injurious effect or influence in the jury's verdict of guilty as to both counts of first degree murder with aggravating circumstances.

## B. The Penalty Phase

■ During the penalty phase of Pirtle's trial, the jury was asked to exercise their moral judgments as to whether Pirtle should receive the death sentence, a very difficult decision that had to be unanimous. Washington Rev.Code § 10.95.060(4) provides:

> Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt, that there are not sufficient mitigating circumstances to merit leniency?"
>
> In order to return an affirmative answer to the question posed by this subsection, *the jury must so find unanimously.*

*Mak v. Blodgett,* 970 F.2d 614, 621 n. 9 (9th Cir.1992).

Therefore, the law of Washington allows any one juror to set aside the death penalty. *Id.* at 621.

Having in mind that the prosecutor argued the inadmissible "you might as well shoot me now" statement in both the guilt and penalty phases bringing it once again to the jury's attention at a time when the jury was to make a most difficult decision whether or not to impose the death penalty, the court cannot find that no juror was influenced or persuaded by the fact that Pirtle had acknowledged he should die for what he had done which then became a part of that juror or jurors' s moral judgment analysis. One can envision very few, if any, more difficult decisions that an individual juror is called upon to make during his or her lifetime than that of whether or not to vote for the imposition of the death penalty. Certainly when one asks himself or herself if a statement by a convicted murderer that he deserves the death penalty would influence one's decision, the answer of most would be in the affirmative.

This court has grave doubts that the "you might as well shoot me now" statement did not have a substantial influence on the death sentence decision of one or more individual jurors. It is impossible to conclude that substantial rights—the difference between death and life without the possibility of parole were not affected. As the Court in *Kotteakos, supra* admonished, "the inquiry cannot be merely whether there was enough to support the result apart from the phase affected by the error."

> If one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239.

[T]he question is, not were the jurors right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.

*Id.* at 764, 66 S.Ct. 1239.

Although the offenses in this case certainly were brutal enough to support the prosecution's death eligibility case, the Supreme Court in *Williams, supra,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389, recently noted that evidence unrelated to a defendant's dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death eligibility case.

This court finds that the involuntary non *Miranda* custodial statement "you might as well shoot me now" could have had a profound effect on the jury considering the penalty options. Hearing the testimony and argument concerning the Pirtle statement was a means of undercutting the jury's own sense of responsibility for imposing the death penalty, instead placing the responsibility on Pirtle's statement that he deserved to be shot for what he did. At a minimum, I have grave doubts about the harmlessness of the error. As stated, *supra,* it is hard to imagine a more difficult moral judgment a person would ever have to make in a lifetime than that of acting as a juror on a death penalty case and deciding whether a person should be executed. Therefore this court cannot find that the testimony and argument by the prosecutor concerning the involuntary non *Miranda* "you might as well shoot me now" statement was harmless as to the death penalty imposed.

For the foregoing reasons, **It Is The Judgment of This Court** that the Washington Supreme Court decisions that no constitutional violations occurred because (1) the State did not know Deputy Walker was going to testify as to Pirtle statement that "you might as will shoot me now"; (2) Pirtle was not entitled to *Miranda* warnings because he was not being interrogated by Deputy Walker; (3) there was no ineffective assistance of counsel for not conducting discovery about any statements made by Pirtle, not effectively cross-examining Deputy Walker about the circumstances in his police report, or for failure to raise any issue concerning the statement on appeal, because there was no error in the use of the "you might as well shoot me now" statement were contrary to or objectively unreasonable applications of controlling authority as determined by the United States Supreme Court.

**It is the Further Judgment of This Court** that the constitutional errors that occurred were harmless and did not prejudice Mr. Pirtle as to the finding in the guilt phase of his trial, but did prejudice Pirtle in the special sentencing phase, and were therefore, not harmless as to the penalty imposed.

Accordingly, **It is Hereby Ordered** that a writ of habeas corpus shall issue commanding the State of Washington to **Vacate and Set Aside** the sentence of death in the case of The State of Washington v. Blake Pirtle of the Superior Court for the County of Spokane, No. 92–1–00955–3 unless within 90 days of the entry of judgment herein, the State of Washington grants Pirtle a new hearing on the sentencing issues without any use of his non *Mirandized* "you might as well shoot me now" statement. If the State does not elect to re-try Pirtle on the sentencing issues, the Superior Court shall Vacate his sentence of death and re-sentence him in accordance with applicable Washington law and the United States Constitution. The Order Staying Execution (Ct. Rec. 12) entered on January 12, 1999 shall remain in full force and effect.

**IT IS SO ORDERED.** The Clerk of this Court is directed to file this Memorandum Opinion and Order, enter judgment as herein specified, and forward copies to counsel, the Clerk of the Spokane County Superior Court, and the Warden of the Washington State Penitentiary.