Blake PIRTLE, Petitioner–Appellant,

v.

Richard MORGAN,* Superintendent of Washington State Penitentiary, Respondent–Appellee.

Blake PIRTLE, Petitioner–Appellee,

v.

Richard MORGAN, Superintendent of Washington State Penitentiary, Respondent–Appellant.

Nos. 01–99012, 01–99013.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 2002.

Filed Dec. 19, 2002.

---

* Richard Morgan, Superintendent, is substituted for his predecessor, John Lambert. *See* Fed. R.App. P. 43(c)(2).

Todd Maybrown, Allen, Hansen & Maybrown, Seattle, WA; James Lobsenz, Carney, Badley, Smith, & Spellman, Seattle, WA, for the petitioner.

Paul D. Weisser, Donna H. Mullen, Assistant Attorneys General, Criminal Justice Division, Olympia, WA, for the respondent.

Before: T.G. NELSON, PAEZ and TALLMAN, Circuit Judges.

PAEZ, Circuit Judge.

Petitioner Blake Pirtle appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 with respect to the guilt phase of his trial, during which he was convicted of two counts of aggravated first-degree murder. The State appeals the district court's order conditionally granting a writ of habeas corpus as to Pirtle's death sentence.

Pirtle raises numerous arguments on appeal. We focus on only one: his claim that he was denied his Sixth Amendment right to effective assistance of counsel when his attorney failed to request a diminished capacity jury instruction. At trial, Pirtle testified that he committed the murders; the only issue in dispute was whether he acted with premeditation. Defense counsel presented substantial evidence through expert testimony to show that Pirtle lacked the capacity to premeditate because, at the time of the murders, he suffered from a right temporal lobe seizure, or "explosive dyscontrol," from chronic drug use. Nonetheless, counsel did not request a diminished capacity instruction, which would have allowed the jury to consider whether Pirtle's mental condition affected his ability to premeditate. Instead, despite the evidence that the drugs that Pirtle had used were wearing off approximately three hours before the murders, defense counsel requested an intoxication instruction. This instruction constricted the jury's consideration of the evidence relating to premeditation to the narrow issue of whether Pirtle was in a state of voluntary intoxication when he committed the murders.

We hold that, in light of the evidence presented in the guilt phase of the trial, defense counsel's failure to request a diminished capacity instruction was constitutionally deficient and that it undermines our confidence in the jury's verdict. Accordingly, we reverse the district court's denial of the writ of habeas corpus with respect to the guilt phase and remand with directions to the district court to grant a conditional writ of habeas corpus.

## I. Factual Background[1]

In the opening statement at Pirtle's trial, defense counsel told the jury that Pirtle killed Ted Folsom and Dawnya Calbreath,

---

1. The facts are drawn from the Washington Supreme Court's opinion in Pirtle's direct appeal, see *State v. Pirtle*, 127 Wash.2d 628, 904 P.2d 245, 251–254 (1996), and supplemented by the record before the district court.

two employees of the Argonne Road Burger King in Spokane, Washington, but argued that he did not premeditate the murders. As the Washington Supreme Court acknowledged, "[t]he defense focused primarily on[Pirtle's] mental capacity at the time of the slayings." *State v. Pirtle*, 127 Wash.2d 628, 904 P.2d 245, 252 (1996) ("*Pirtle I*").

Both Pirtle and expert witnesses testified in support of a diminished capacity defense. Pirtle testified that he had a long history of drug use. On the Thursday and Saturday before the murders, Pirtle injected cocaine and "crystal meth." After injecting methamphetamine on Saturday night, Pirtle told the jury, he became paranoid and began hallucinating. Thereafter, at some point between 1:00 a.m. and 2:30 a.m., he used cocaine and marijuana. Pirtle explained that the effects of the drugs were wearing off—specifically, he was "startin' to come down really hard"—at approximately 4:30 a.m. or 4:45 a.m. and that he wanted more drugs. To that end, he decided to rob the Burger King. Pirtle's sister, Davida, also testified that Pirtle appeared to be "coming down" from the drugs around 5:00 a.m.

Pirtle testified that he went to the Burger King to "get some more money to get drugged out again," but did not go with the intent to kill. He brought a knife from his kitchen. After he arrived at the Burger King a little after 7:00 a.m. and gave his name as employee Wesley LeDoux, Folsom let him in the back door of the restaurant. Pirtle told Calbreath that he was robbing the store, and cut the telephone wire. Pirtle then put Folsom and Calbreath in the freezer with their hands bound behind their backs.

Pirtle testified that he took money from the tills and the safe and planned to leave. He then told a drive-through customer that the restaurant would not be open for twenty minutes. Pirtle told the jury that he took Calbreath out of the freezer to "intimidate" her with a bread knife that he picked up in the restaurant to ensure that she would not tell anyone that he had robbed the Burger King and to give him time to "get out of the state or whatever." He testified that Calbreath grabbed the knife and that there was a struggle, which led to her hand wounds. At the sight of blood on the knife, Pirtle explained, he "snapped." He then killed both Calbreath and Folsom.

The evidence showed that Pirtle crushed Folsom's skull, cut his neck after he was unconscious, with nine wounds to the front of the neck and eight to the back, and used a hacksaw, which was left in Folsom's back. Pirtle hit Calbreath's head, probably with a paint can. He cut her neck with a knife at least sixteen times, and she had knife wounds on her hands. The examining doctor speculated that Calbreath first suffered the wounds to her hands, probably trying to defend herself, and then Pirtle knocked her unconscious with the paint can and inflicted the neck wounds.

In addition to Pirtle's testimony that he "snapped" before committing the murders, defense counsel "offered extensive expert testimony in an effort to establish Pirtle's diminished capacity to premeditate." *Id.* at 253. Three clinical psychologists and one neuropharmacologist testified on Pirtle's behalf. Dr. Phillip Murphy opined that Pirtle suffered a temporal lobe seizure at the time of the murders. This seizure, according to Dr. Murphy, caused Pirtle to experience a level of amnesia. For example, the fact that Pirtle could not remember using a hacksaw is consistent with a level of amnesia that may result from a temporal lobe seizure. Dr. Murphy testified that, as a result of the seizure, Pirtle could not premeditate at the time of the murders.

Like Dr. Murphy, Dr. Jonathan Lipman, the neuropharmacologist, opined that Pirtle probably suffered a temporal lobe seizure at the time of the murders. Dr. Lipman explained that the right temporal lobe of the brain can develop heightened sensitivity from chronic drug use—known as "kindling"—which leads to effects that resemble schizophrenia, including hallucination, delusions, and paranoia. Once the brain is kindled, the kindling can last for several years. Kindling is associated with chronic, not acute, drug use. Dr. Lipman opined that Pirtle's brain was "kindled" from chronic drug use at the time of the murders, which was supported by the fact that Pirtle experienced auditory and visual hallucinations prior to leaving his home for the Burger King.

Dr. Lipman explained that kindling may cause seizures, or "explosive dyscontrol." He testified: "Kindling is what happened before the explosive dyscontrol. Once the dyscontrol has occurred, kindling is kind of irrelevant[; ] you've fallen off the cliff." This state of explosive dyscontrol frequently involves "repetitive stabbing or repetitive movements due to ... dopamine stimulation of the brain." Dr. Lipman testified that the victims' neck wounds were consistent with explosive dyscontrol in a kindled person. He opined that Pirtle suffered from explosive dyscontrol at the time of the murders, which "le[ft] him without the ability to rationally think, merely to explode." Dr. Lipman testified that, in his opinion, Pirtle was incapable of premeditating the murders. Dr. Lipman emphasized that this condition was due to chronic drug use and not to acute use or intoxication.

Dr. Dennis Pollack also testified that Pirtle did not have the ability to premeditate the murders because of his drug and alcohol dependency and his drug use prior to the incident. Dr. Pollack diagnosed Pirtle with a personality disorder with anti-social and borderline features. Dr. Karen Sheppard testified, similar to Dr. Murphy and Dr. Lipman, that Pirtle's frontal lobes had been impaired from drug use at the time of the murders, which impaired his ability to evaluate a situation, to be organized, and to make decisions.

The State presented testimony on rebuttal that ultimately led the district court to grant a conditional writ as to Pirtle's death sentence. Over defense counsel's objection, the State called Deputy Calvin Walker in order to show how Pirtle appeared at the time of arrest "in reference to the large amount of testimony that [was] presented concerning [Pirtle's] . mental state[.]" Deputy Walker testified that, while Pirtle was on the ground with guns pointed at his head, he asked if Pirtle knew that he was under arrest. Then, without informing Pirtle of his *Miranda* rights, Walker asked Pirtle if he knew *why* he was under arrest. Pirtle responded, "Of course I do[;] you might as well shoot me now." Defense counsel did not object to this statement. On the basis of Deputy Walker's testimony, the State argued that Pirtle could not have suffered from a seizure at the time of the murders because he did not suffer from a seizure when he was under the stress of an arrest at gunpoint.

Defense counsel requested an intoxication instruction, which relates to defendants who commit crimes in a state of intoxication. The instruction provided:

No act committed by a person *while in a state of voluntary intoxication* by alcohol or drugs is less criminal by reason of that condition. However, evidence of intoxication by alcohol or drugs may be considered in determining whether the defendant acted with intent or premeditated intent to kill.

The term intoxication refers to an impaired mental and bodily condition

which may be produced either by alcohol, which is a drug, or by any other drug.

(Emphasis added). Defense counsel did not request a diminished capacity jury instruction, although one was included in the same book of pattern instructions as was the voluntary intoxication instruction.

The jury found Pirtle guilty of first-degree premeditated murder for Calbreath's death, with two aggravating factors—(1) the murders were committed in the course of a first-degree or second-degree robbery, and (2) the murders were part of a common scheme or plan. The jury reached the same conclusion with respect to Folsom's death, finding an additional aggravating circumstance of committing the murder to conceal the perpetrator's identity. During the special death penalty proceeding, the jury returned a verdict of yes to the special sentencing issue of whether to impose the death penalty. The court then sentenced Pirtle to death.

## II. Procedural History

On direct appeal, the Washington Supreme Court affirmed Pirtle's conviction and death sentence. *Pirtle I*, 127 Wash.2d 628, 904 P.2d 245, *cert. denied*, 518 U.S. 1026, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996). Pirtle then filed a personal restraint petition in the Washington Supreme Court, which was denied. *In re Pirtle*, 136 Wash.2d 467, 965 P.2d 593 (1998) ("*Pirtle II*"). In the petition, Pirtle raised an ineffective assistance of counsel claim for, among other things, failing to request the diminished capacity jury instruction. Although he did not raise this issue on direct appeal, the Washington Supreme Court refused to reach it under its relitigation rule, *id.* at 607–08 & n. 9, which prohibits relitigation of issues raised on direct appeal.

Thereafter, Pirtle filed a petition for a writ of habeas corpus in federal district court. The district court dismissed Pirtle's diminished capacity instruction claim, concluding that federal habeas review was barred because the Washington Supreme Court had denied it on the basis of a state procedural rule. After dismissing Pirtle's other claims, the district court allowed discovery on Pirtle's claims relating to the "shoot me now" statement to the arresting officer.

In a careful opinion, the district court concluded that the "shoot me now" statement was both elicited in violation of *Miranda* and involuntary. *Pirtle v. Lambert*, 150 F.Supp.2d 1078 (E.D.Wash.2001) ("*Pirtle III*"). In determining that Pirtle's "shoot me now" statement was elicited in violation of *Miranda*, the district court relied on *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), neither of which the Washington Supreme Court addressed. *Pirtle III*, 150 F.Supp.2d at 1088–92. The district court explained that it was undisputed that Pirtle was in custody when Deputy Walker asked him if he knew why he was under arrest, and that Pirtle was being interrogated because the statement was reasonably likely to elicit an incriminating response. Because Pirtle was subject to a custodial interrogation, law enforcement had a duty to issue *Miranda* warnings prior to asking the question.

The district court also found that Pirtle's statement was involuntary because of the severe physical coercion that he experienced when he was arrested: the police officers pointed guns at his head and threatened him with death if he did not cooperate with them. *Id.* at 1094.

The district court concluded, under the Antiterrorism and Effective Death Penalty

Act of 1996, Pub.L. No. 104–132, 110 Stat. 1218 (April 24, 1996) ("AEDPA"), that the Washington Supreme Court's opinion that Pirtle's due process, Fifth Amendment, and Sixth Amendment rights were not violated was either contrary to or an unreasonable application of clearly established federal law. *Pirtle III*, 150 F.Supp.2d at 1088.

After finding constitutional error, the district court concluded that, at the guilt phase, there was no prejudice under *Strickland* and that the error was harmless. *Id.* at 1095–97. It concluded, however, that the error was not harmless at the penalty phase because Pirtle "had acknowledged he should die for what he had done" and his statement was a "means of undercutting the jury's own sense of responsibility for imposing the death penalty, instead placing the responsibility on Pirtle's statement that he deserved to be shot for what he did." *Id.* at 1097–98.

Accordingly, the district court granted a conditional writ of habeas corpus directing the State to vacate Pirtle's death sentence or to grant a new hearing on the sentencing issues without the admission of the "shoot me now" statement.[2]

Pirtle timely appealed the district court's denial of the writ with respect to his conviction. The district court issued a Certificate of Appealability on five issues.[3] The State appealed the district court's order conditionally granting the writ of habeas corpus as to Pirtle's death sentence.

## III. Application of the Antiterrorism and Effective Death Penalty Act

We review de novo the district court's ruling on Pirtle's habeas petition. *See Avila v. Galaza*, 297 F.3d 911, 914 n. 1 (9th Cir.2002). Because Pirtle filed his habeas petition after AEDPA's effective date, AEDPA applies. *See Lindh v. Murphy,*

---

**2.** We need not reach Pirtle's claims involving the "shoot me now" statement because we conclude that a conditional writ is proper with respect to the guilt phase in light of counsel's constitutionally deficient performance in failing to request the diminished capacity jury instruction. Nonetheless, we commend the district court's thorough and thoughtful analysis of the *Miranda* and voluntariness issues to the state courts, which points out the deficiencies in the Washington Supreme Court's ruling on Pirtle's personal restraint petition.

**3.** The five issues were:

1. Whether the Washington Supreme Court erroneously denied Pirtle's claim that the use of Pirtle's "shoot me now" statement violated his constitutional rights as to the guilt phase of his trial;

2. Whether the Washington Supreme Court erroneously denied Pirtle's claim that Pirtle's constitutional rights were violated during the guilt and penalty phases of Pirtle's trial due to Pirtle's counsel having a conflict of interest by also representing three witnesses who testified against Pirtle at trial;

3. Whether the Washington Supreme Court erroneously denied Pirtle's claim that Pirtle's constitutional rights were violated during the guilt and penalty phases of his trial because significant impeachment evidence concerning the State's two informant witnesses [Darin] Wheeler and Shane Botner was never disclosed to the defense prior to trial;

4. Whether the Washington Supreme Court erroneously denied Pirtle's claim that Pirtle's constitutional rights were violated during the guilt and penalty phases of his trial because [Darin] Wheeler, an alleged agent of the State deliberately elicited a statement from Pirtle about the crime he was charged with outside the presence of Pirtle's counsel;

5. Whether the Washington Supreme Court erroneously denied Pirtle's claim that Pirtle's constitutional rights were violated due to ineffective assistance of counsel during the guilt and penalty phases of Pirtle's trial in ways unrelated to Pirtle's "shoot me now" statement.

521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

██ Under AEDPA, federal courts may grant a writ of habeas corpus only if the state court ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it fails to apply the correct controlling Supreme Court authority or comes to a different conclusion when presented with a case involving materially indistinguishable facts. *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). A decision is an "unreasonable application" of Supreme Court law if the state court identifies the correct legal standard but applies it in an unreasonable manner to the facts before it. *Id.*

██ We have relaxed AEDPA's strict standard of review when the state court reaches a decision on the merits but provides no reasoning to support its conclusion. Under such circumstances, we independently review the record to determine whether the state court clearly erred in its application of Supreme Court law. *Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling feder-

al law."); *see also, e.g., Greene v. Lambert,* 288 F.3d 1081, 1089 (9th Cir.2002). That is, although we independently review the record, we still defer to the state court's ultimate decision.

██ Here, however, we know that the Washington Supreme Court did not reach the merits of Pirtle's claim that his counsel's performance was constitutionally defective when his counsel failed to request the diminished capacity instruction at the guilt phase of the trial. Thus, there is no state court decision on this issue to which to accord deference. Under these circumstances, concerns about comity and federalism that arise when a state court reaches the merits of a petition for post-conviction relief do not exist. *Cf. Williams v. Taylor,* 529 U.S. 420, 437, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (explaining that "comity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort"). Accordingly, following our sister circuits—the Third and the Fifth—we hold that when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo.[4] *See Appel v. Horn,* 250 F.3d 203, 210 (3d Cir. 2001) (holding that a federal habeas court must review de novo purely legal issues and mixed questions of law and fact when, "although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court"); *Mercadel v. Cain,* 179 F.3d 271, 274–75 (5th Cir.1999) (per curiam) (holding that "the AEDPA deference scheme outlined in 28 U.S.C.

---

**4.** We recognize that we applied *Delgado's* less-deferential "independent review of the record" standard to our review of the prejudice prong of a *Strickland* claim when the state court had not reached that prong but had dismissed the claim on *Strickland's* error

prong. *See Avila v. Galaza,* 297 F.3d 911, 921 (9th Cir.2002). Although the state court did not reach the prejudice issue in that case, it did reach the merits of the claim. Here, in contrast, the state court did not reach the merits at all.

§ 2254(d)" did not apply to the federal habeas petition because the state denied the petitioner's motion for post-conviction relief on procedural grounds and not on the merits). Nonetheless, under AEDPA, factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence. *See Appel,* 250 F.3d at 210; 28 U.S.C. § 2254(e).

## IV. Discussion

### A. Procedural Bar

██ There is one final issue to address before reaching the merits of Pirtle's claim of ineffective assistance of counsel for failure to request the diminished capacity jury instruction. We must determine whether the district court erred by concluding that this claim was procedurally barred. As noted, the Washington Supreme Court refused to address this claim in Pirtle's personal restraint petition because he had "already challenged the jury instructions in numerous ways," and a personal restraint petition is not a "forum for relitigation of issues already considered on direct appeal[.]" *Pirtle II,* 965 P.2d at 607 (internal quotation marks and citation omitted). The Washington Supreme Court reached this conclusion despite the fact that Washington does not permit a defendant to raise issues on direct appeal that require evidence outside the record. *See State v. McFarland,* 127 Wash.2d 322, 899 P.2d 1251, 1257 (1995). A claim for ineffective assistance of counsel generally falls within this category. As we have explained under federal law, such a claim "normally should be raised in habeas corpus proceedings, which permit counsel 'to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted.'" *United States v. Ross,* 206 F.3d 896, 900 (9th Cir.2000) (quoting *United States v. Pope,* 841 F.2d 954, 958

(9th Cir.1988)). Thus, "the appropriate means" of raising such an issue is through a personal restraint petition. *See McFarland,* 899 P.2d at 1257.

The district court sua sponte raised the issue of procedural default. It concluded that the Washington Supreme Court, in relying on its relitigation rule, denied this claim on the basis of an "independent and adequate state ground"—a state procedural rule—and that Pirtle failed to excuse his default. *See Coleman v. Thompson,* 501 U.S. 722, 729–30, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

██ We review de novo the district court's conclusion that this issue was procedurally defaulted. *See Morales v. Calderon,* 85 F.3d 1387, 1389 n. 6 (9th Cir. 1996). Pirtle argues, and the State concedes, that he did not violate any state rule that could amount to a procedural bar. Washington's relitigation rule does not serve as a bar to habeas review. In *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), the Supreme Court addressed California's *Waltreus* rule, which, like Washington's relitigation rule, provides that an issue raised and rejected on direct appeal generally cannot be raised in a state habeas petition. *Id.* at 805, 111 S.Ct. 2590. The Court explained that a state's reliance on the relitigation rule does not amount to a ruling on the merits or a denial on procedural grounds, and therefore does not bar federal review. *Id.* at 805–06, 111 S.Ct. 2590; *see also Hill v. Roe,* 298 F.3d 796, 798 (9th Cir.2002) (addressing California's *Waltreus* rule); *Calderon v. United States Dist. Court for Eastern Dist. of California,* 96 F.3d 1126, 1131 (9th Cir.1996) (same). Thus, we conclude that Pirtle's claim is not procedurally barred, and now turn to the merits of the claim.

## B. Ineffective Assistance of Counsel

 We hold that Pirtle's counsel rendered ineffective assistance in violation of Pirtle's Sixth Amendment rights by failing to request a diminished capacity jury instruction. The only issue in dispute was whether Pirtle premeditated the murders. Although the jury could have reasonably concluded that Pirtle was not intoxicated when he committed the murders because he testified that he was "coming down" from drugs approximately three hours before the murders, his counsel requested only an intoxication instruction. This instruction prevented the jury from considering Pirtle's argument that he was incapable of premeditating the murders because of a mental disorder caused by chronic drug use. We conclude that the error was prejudicial.

To establish ineffective assistance of counsel, Pirtle must show that his counsel's performance "fell below an objective standard of reasonableness" and that counsel's deficient performance prejudiced his defense. *See Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[5] Our "scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. 2052. We shift our perspective to "the time of counsel's conduct," shedding the "distorting effects of hindsight." *Id.* at 689–90, 104 S.Ct. 2052.

To put Pirtle's appeal into perspective, he "does not contend that effective counsel would have secured him an acquittal on the basic charges." *Phillips v. Woodford,* 267 F.3d 966, 976 (9th Cir.2001). Rather, he

asserts that had counsel presented the diminished capacity jury instruction at trial, "there is a reasonable probability that the jury would not have found him eligible for the death penalty[.]" *Id.*

### 1. Deficient Performance

We conclude that Pirtle has successfully rebutted the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. A reasonably competent attorney would have requested a diminished capacity instruction in light of (1) the fact that Washington had long recognized a diminished capacity defense prior to Pirtle's trial; (2) defense counsel's theory that Pirtle's brain was kindled from chronic drug use and then he suffered from a seizure, or explosive dyscontrol, at the time of the murders that impaired his ability to premeditate; and (3) the fact that there was evidence to support a finding that Pirtle was not intoxicated at the time of the murders.

 Despite the substantial evidence that defense counsel presented that Pirtle could not premeditate at the time of the murders due to a temporal lobe seizure, or explosive dyscontrol, defense counsel did not request the diminished capacity instruction. Washington had recognized a diminished capacity defense long before Pirtle's trial in 1993. *See Washington v. Griffin,* 100 Wash.2d 417, 670 P.2d 265, 266 (1983) (citing *State v. Ferrick,* 81 Wash.2d 942, 506 P.2d 860 (1973)). A diminished capacity instruction is warranted when there is "substantial evidence of

---

**5.** For *Strickland* claims, there is no harmless error analysis under *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Avila,* 297 F.3d at 918 n. 7 ("We need not conduct a harmless error review of *Strickland* violations under *Brecht* [ ], because '[t]he *Strickland* prejudice analy-

sis is complete in itself; there is no place for an additional harmless-error review.'" (quoting *Jackson v. Calderon,* 211 F.3d 1148, 1154 n. 2 (9th Cir.2000), *cert. denied,* 531 U.S. 1072, 121 S.Ct. 764, 148 L.Ed.2d 665 (2001))).

such a condition, [and] the evidence must logically and reasonably connect the defendant's alleged mental condition with the asserted inability to form the required specific intent to commit the crime charged." *Id.* (quoting *Ferrick,* 506 P.2d at 862) (alteration in original). A generalized instruction on criminal intent is insufficient to instruct a jury about mental disorders which could diminish a defendant's capacity to commit a crime. *Id.*

At the time of Pirtle's trial, Washington's model diminished capacity instruction provided:

> Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant has the capacity to form _____ [Fill in requisite mental state].

Washington Pattern Jury Instruction: Criminal No. 18.20 (1993).

Instead of a diminished capacity instruction, defense counsel requested a voluntary intoxication instruction, which provided:

> No act committed by a person *while in a state of voluntary intoxication* by alcohol or drugs is less criminal by reason of that condition. However, evidence of intoxication by alcohol or drugs may be considered in determining whether the defendant acted with intent or premeditated intent to kill.
>
> The term intoxication refers to an impaired mental and bodily condition which may be produced either by alcohol, which is a drug, or by any other drug.

(Emphasis added.) [6]

The State argues that the intoxication instruction was sufficient and proper be-

cause "[t]he record does not reflect that [Pirtle's] alleged mental disorder existed independent of the drug abuse." The State contends that "both instructions say essentially the same thing" and that the intoxication instruction was more appropriate because of Pirtle's drug use prior to the murders.

The diminished capacity instruction, however, is materially distinct from the intoxication instruction, and was proper under the circumstances. The defense's theory was that Pirtle's chronic drug use caused a temporal lobe seizure, or explosive dyscontrol, at the time of the murders, which prevented him from being able to premeditate.

Although the jury could have concluded that Pirtle was intoxicated at the time of the murders, this was not the only reasonable conclusion for the jury to draw. On the state of the record, it would have been reasonable for the jury to conclude that Pirtle was no longer in a state of intoxication when he committed the murders. Pirtle testified that the effects of the drugs that he used prior to the murders were diminishing by approximately 4:30 a.m. or 4:45 a.m.—that is, he was "com[ing] down" from the drugs—and therefore he wanted more. Pirtle's sister corroborated this. Approximately three hours later, Pirtle committed the murders.

Nonetheless, the jury was instructed that it could consider the effect of drugs on Pirtle's ability to premeditate only if he was "in a state of voluntary intoxication." If the jury concluded that Pirtle was not in a state of voluntary intoxication at the

---

**6.** This instruction was derived from Washington Pattern Jury Instruction: Criminal No. 18.10 (1993), which, at the time of Pirtle's trial, provided:

> No act committed by a person while in a state of voluntary intoxication is less crimi-

nal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant [acted] [or] [failed to act] with _____ [Fill in requisite mental state].

time of the murders then it had no legal context in which to interpret the expert testimony about the effect of Pirtle's chronic drug use on his ability to premeditate. That is, the jury had no legal framework in which to place the psychologists' and the neuropharmacologist's testimony. *Cf. Penry v. Johnson*, 532 U.S. 782, 797, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (holding that the jury should have been provided with a "vehicle ... to give mitigating effect to the evidence of [the petitioner's] mental retardation and childhood abuse" in the sentencing phase of a death penalty case); *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) (explaining that the Supreme Court "presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them"). Without the diminished capacity jury instruction, defense counsel could not tie the evidence to the law, rendering null defense counsel's efforts to succeed in the central issue— whether Pirtle could premeditate the murders. Put another way, the intoxication instruction misled the jurors to believe that if Pirtle was not intoxicated at the time of the murders, then they could not find that he suffered from a diminished capacity.

This would be a very different case if the only reasonable inference for the jury to draw from the evidence was that Pirtle was intoxicated at the time of the murders. Under such circumstances, either the diminished capacity or the intoxication instruction would have sufficed pursuant to a Washington court of appeals decision, *State v. Hansen*, 46 Wash.App. 292, 730 P.2d 706, 711 (1986), *amended*, 737 P.2d 670 (Wash.App.1987), decided prior to Pirtle's trial. In *Hansen*, the defendant "injected himself with several large doses of cocaine" at the time of his crime. *Id.* at 708. An expert witness opined that the defendant's drug use caused schizophrenia, which affected his ability to form the requisite intent. *Id.* at 711. The Washington court of appeals concluded that the intoxication instruction permitted the defendant to argue his case, and therefore the trial court did not err by refusing to give the diminished capacity instruction. *Id.*; *cf. U.S. v. Mason*, 902 F.2d 1434, 1438 (9th Cir.1990) (holding that it is not reversible error for a trial court to reject a defendant's proposed jury instruction on his theory of the case "if other instructions, in their entirety, adequately cover that defense theory").[7]

As Pirtle's trial counsel conceded in the habeas proceeding, they did not make a tactical decision to propose the intoxication

---

7. The State relies on *State v. Furman*, 122 Wash.2d 440, 858 P.2d 1092 (1993), to support its argument that the trial court was not required to give the diminished capacity instruction. *Furman*, however, was decided after Pirtle's trial. Further, it is distinguishable. First, unlike here, the evidence in *Furman* showed that the defendant was both intoxicated and suffering from a severe personality disorder at the time of the murder. *Id.* at 1096. Second, the jury was given the more general diminished capacity instruction, under which the defendant could argue that "drug use and other factors" prevented him from being able to premeditate the mur-

der. *Id.* at 1101. Although one can argue that intoxication at the time of the offense is a form of mental impairment and thus one can argue the effects of intoxication within the context of the diminished capacity instruction, as in *Furman*, the converse is not true. It is not possible to argue that a diminished mental capacity—as a result of a mental disorder independent from intoxication at the time of the offense—falls within the intoxication instruction. The intoxication instruction encompasses only those individuals in a state of intoxication at the time of the offense.

instruction instead of the diminished capacity instruction. Notably, despite their acknowledgment that the "main thrust of the defense" was that Pirtle's "ability to premeditate was impaired by his physical and psychological injuries[caused by chronic drug use] and that Mr. Pirtle likely suffered a temporal lobe seizure at the time of the killings," neither attorney considered proposing a diminished capacity instruction. Trial counsel acknowledged that the intoxication instruction "did not capture the true nature of [the] defense" and that, without the diminished capacity instruction, the jury was "left without any guidance as to the significance of the defense testimony."

## 2. Prejudice

■ After concluding that defense counsel's representation was deficient, we must determine whether Pirtle was prejudiced by the error. Pirtle argues that in light of the evidence presented during the guilt phase of the trial, the jury, if provided with the diminished capacity instruction, could have reasonably concluded that he did not premeditate the murders. We agree.

Under *Strickland*, we must ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052; *accord Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir.2002). "A 'reasonable probability' is less than a preponderance: '[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.'" *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In undertak-

ing this assessment, we must assess the "totality of the evidence." *Id.* at 695, 104 S.Ct. 2052.

■ The only issue in dispute at the guilt phase of Pirtle's trial—premeditation—was critical. As noted, resolution of this issue determined whether Pirtle was eligible for the death penalty. Under Washington law, premeditation is an element of first-degree, but not second-degree, murder. *State v. Bowerman*, 115 Wash.2d 794, 802 P.2d 116, 123 (1991). A defendant convicted of second-degree murder cannot be sentenced to death. Wash. Rev.Code §§ 9A.32.030, 10.95.020; *State v. Fortune*, 128 Wash.2d 464, 909 P.2d 930, 933 (1996).

Pirtle's organized, reasoned actions prior to the murders are consistent with an intent to rob, but not necessarily an intent to kill. Pirtle's actions after seeing the blood on Calbreath's hands are markedly different, lacking the logical deliberate character of his prior actions. Pirtle contends that the jury could have reasoned that he decided to rob the Burger King because he was angry that he had been fired, and that he brought a knife to intimidate the employees present at the restaurant. The jury could have decided that he did not wear a mask to facilitate entry, enabling him to ring the buzzer rather than break in. The jury could have concluded that Pirtle tied up Calbreath and Folsom because he did not intend to kill them; otherwise, presumably he would have murdered them immediately. Pirtle also provided an explanation for why he returned to the freezer. He testified that he wanted to intimidate Calbreath so that she would not inform anyone that he committed the robbery. Once a struggle ensued and Pirtle saw blood, he "snapped" or, as the experts explained, suffered from a temporal lobe seizure, or explosive dys-

control. As a result, Pirtle may not have had the ability to premeditate at that time.

Pirtle also explains that all of the weapons that he used were from the restaurant, indicating that he did not plan the murders before going to the restaurant. According to Dr. Lipman, the victims' neck wounds were consistent with the behavior of someone whose brain was kindled and suffering from explosive dyscontrol. That Pirtle did not remember the hacksaw and other parts of his crimes is consistent with Dr. Murphy's testimony that Pirtle suffered from a seizure, which caused a certain level of amnesia. The fact that Pirtle later attempted to cover up his crime is not inconsistent with the possibility that he suffered from a seizure or explosive dyscontrol at the time of the murders.

The Sixth Circuit's opinion in *Barker v. Yukins*, 199 F.3d 867 (6th Cir.1999), which addressed a due process violation, is instructive here.[8] In that case, the petitioner, Stacey Barker, was convicted of murder in state court, and subsequently filed a federal habeas petition. Barker's theory at trial was that she committed the murder in self defense to prevent an imminent rape. The trial court instructed the jury that Barker was entitled to use deadly force in self defense if she honestly believed that she was in danger of death or serious bodily injury. The trial court refused to instruct the jury that, under Michigan law, Barker could use deadly force to resist a rape. The Michigan Supreme Court found that the trial court erred by refusing to give the more specific rape instruction, but that the error was harmless.

Under AEDPA's deferential standard of review, the Sixth Circuit held that the Michigan Supreme Court's finding of harmless error was an unreasonable application of federal law. The Sixth Circuit reasoned that it had "no way of knowing" whether the jurors rejected Barker's self defense claim because, even though they believed that she was about to be raped, they did not think that she was in danger of death or serious bodily injury. *Id.* at 873–74. The court held that this uncertainty raised "grave doubt as to whether the general self defense instruction created a substantial and injurious influence on the verdict." *Id.* at 873 (citing *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

As in *Barker*, here the jury could have believed Pirtle's testimony that he did not intend to commit the murders and only did so after he "snapped," which was supported by the experts' testimony. If the jury concluded that Pirtle was not intoxicated, however, then it would not have been able to consider Pirtle's diminished capacity defense. As in *Barker*, we cannot know what effect the intoxication instruction, or failure to give the diminished capacity instruction, had on the jury.

We recognize that there was evidence that Pirtle premeditated the murders. The State presented circumstantial evidence to support this conclusion.[9] It also

---

8. We recognize that *Barker* involved a harmless error analysis under *Brecht*, which involves a lower standard than *Strickland's* standard for prejudice. *See Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Nonetheless, we find *Barker* persuasive.

9. The State relied primarily on the following circumstantial evidence to show premeditation: Pirtle had a motive to kill Calbreath because she had been a witness for management when he was terminated; Pirtle supposedly needed money for drugs but decided to rob the Burger King instead of taking his mother's "fairly sizable amount of money" from his house; he took a knife with him; he brought clothes with him (which Pirtle disputed); and he "had the presence of mind" to attempt to cover up his crime.

"effectively crossexamined each expert witness providing a factual basis sufficient for the jury to find Pirtle's capacity for premeditation was not eliminated by his mental condition, by cocaine intoxication, or by 'kindling' of his brain at the time of the murders."[10] *Pirtle I,* 904 P.2d at 257. The Washington Supreme Court found that there was enough evidence to withstand a sufficiency of the evidence challenge on direct appeal. *Pirtle I,* 904 P.2d at 255–57. This, however, required the Washington Supreme Court to draw all reasonable inferences in favor of the State and then to decide whether the jury could have concluded that Pirtle premeditated the murders.

In contrast, under the standard that we must apply, we would be "improperly invad[ing] the province of the jury" if we determined that no reasonable juror would have believed that Pirtle intended only to rob the Burger King and then committed the murders after he suffered from a temporal lobe seizure, or explosive dyscontrol. *See Barker,* 199 F.3d at 874. This weighing of evidence and credibility determina-

tion is for the jury. *Cf. Payton v. Woodford,* 299 F.3d 815, 829 n. 12 (9th Cir.2002) ("We steer clear of determining the value of the evidence in favor of ensuring that the jury had the opportunity to decide for itself whether Payton's religious beliefs were merely 'fortuitous.' ").

In sum, we lack confidence about the outcome of Pirtle's trial because of the possibility that the jury rejected Pirtle's diminished capacity defense only because it found that he was not intoxicated at the time of the murders. There is no countervailing possibility that the jury rejected the diminished capacity defense on the merits, because it was not told of the availability of the defense. If the jury had been given the diminished capacity instruction, then it reasonably could have found that Pirtle did not premeditate the murders even if it concluded that he was not intoxicated. Pirtle is entitled to have a jury make this determination. Accordingly, we conclude that there is a reasonable probability that, but for Pirtle's counsel's deficient performance, the outcome of his trial would have been different.[11]

---

**10.** On cross-examination, the State elicited testimony from Dr. Pollack that suggested that Pirtle intentionally tried to make himself look bad during testing, and that many tests did not allow Dr. Pollack to come to a conclusion about Pirtle's ability to premeditate. Dr. Pollack also explained that his definition of premeditation involved planning in an organized and systematic fashion, and he acknowledged that Pirtle had the capacity to decide to commit the crime, plan it, and execute the plan. Dr. Lipman conceded that someone under the influence of the drugs that Pirtle used could carry out an intent to do something and that his "energy to fulfill a motive could be enhanced." Dr. Murphy acknowledged that he based his testimony on Pirtle's account of the events, and "a person of normal or even borderline normal intelligence could recognize" that his statements in such circumstances might be incriminating.

The State also called Dr. Roy Mays, a psychologist, who testified that Pirtle tried to

portray himself in a bad light when taking the Minnesota Multiphasic Personality Inventory test, and thus, the test results were invalid. Dr. Mays also testified that the neuropsychological tests did not indicate either a neurological problem or mental incapacity.

**11.** Because we direct the district court to order a conditional writ of habeas corpus in light of Pirtle's ineffective assistance of counsel claim for failing to request the diminished capacity jury instruction, we do not reach the other issues that Pirtle raises. *See Karis v. Calderon,* 283 F.3d 1117, 1127 n. 2 (9th Cir. 2002), *petition for cert. filed* (U.S. Sep. 13, 2002) (No. 02–434) ("Because we affirm the district court's decision to grant Karis' petition for ineffective assistance of counsel in the penalty phase, we do not reach Karis' claim with regard to the prosecutor's having mentioned Steuben's testimony during the penalty phase."). In light of our disposition, we dismiss the State's appeal as moot.

## V. Conclusion

Because we conclude that Pirtle's Sixth Amendment rights were violated when his counsel rendered ineffective assistance by failing to request the diminished capacity jury instruction, we reverse the district court's denial of the writ of habeas corpus with respect to the guilt phase. On remand, the district court shall enter judgment granting a conditional writ of habeas corpus directing that Pirtle be released from custody unless the State of Washington begins trial proceedings against Pirtle within 180 days or as extended by the district court as reasonably necessary.

Appeal No. 01–99012: REVERSED AND REMANDED.

Appeal No. 01–99013: DISMISSED AS MOOT.

TALLMAN, Circuit Judge, concurring and dissenting:

I respectfully disagree with the Court's conclusion that Pirtle's constitutional rights were violated because of his counsel's failure to request a diminished capacity jury instruction. Pirtle's claim of diminished capacity was based on his voluntary use of illicit drugs hours before the murders *in combination with* the long-term effects of chronic drug abuse on his brain. Washington's voluntary intoxication instruction provided an adequate vehicle for the jury to evaluate the evidence introduced by the defense. Both counsel argued extensively that the only issue for the jury to decide was Pirtle's ability to form premeditated intent to kill. Under Washington law, the instruction Pirtle's counsel requested provided sufficient guidance to the jury in its deliberations. Pirtle's ineffective assistance of counsel claim fails under state and federal

law and I would uphold his conviction and death sentence against all other claims contained in the habeas petition.

### I

As a preliminary matter, I agree with the Court that there is no procedural bar to our consideration of this issue for the first time on appeal. Under *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), and our own case law, a state rule barring relitigation of claims during state habeas proceedings does not bar a federal court's consideration of those claims during federal habeas review. *See Calderon v. United States Dist. Court,* 96 F.3d 1126, 1131 (9th Cir.1996) (citing *Ylst,* 501 U.S. at 806, 111 S.Ct. 2590).

### II

On the merits, however, after reviewing the entire state criminal trial transcript and the evidence discovered in the federal habeas litigation, I cannot agree with the Court's conclusions regarding Pirtle's Sixth Amendment claim.

Under the first prong of the *Strickland* analysis, the Court articulates three premises for its holding that a reasonably competent attorney would have requested a diminished capacity instruction: (1) Washington recognizes a diminished capacity defense; (2) Pirtle's defense theory was that he suffered a seizure or explosive dyscontrol at the time of the murders; and (3) Pirtle was not intoxicated at the time of the murders. The record fails to support the conclusion reached by the Court.

The totality of the record adduced at trial shows that Pirtle was intoxicated, as defined in the jury instructions,[1] at the

---

1. Washington's Voluntary Intoxication Instruction (given to jury):

No act committed by a person while in a state of voluntary intoxication by alcohol or

time of the murders. The defendant's experts relied heavily on the fact that, while Pirtle's chronic drug use rendered Pirtle mentally ill and prone to seizures, it was his acute drug use just hours before the murders that induced the seizure or explosive dyscontrol. In other words, drug and alcohol abuse was the catalyst that triggered the mental or bodily impairment created by years of chronic substance abuse by Pirtle, making premeditation impossible.

For example, defense expert Dr. Dennis Pollack, a clinical psychologist, testified on direct:

Q Do you have an opinion, Dr. Pollack, based upon reasonable, medical probability, whether or not Mr. Pirtle's mental disorder *would have been affected by a significant use of drugs or alcohol within three to four hours preceding the incident at the Burger King restaurant?*

A Well, *given the fact that he kind of just recently used drugs, it would increase the difficulties in controlling behavior with regard to the Axis II diagnosis,* the personality problems, but also the prolonged history of the drug abuse and the alcohol. *It basically takes a long time to come down from the influence of those drugs* when you have been doing to the brain what he had been doing.

Q How would Mr. Pirtle's mental disorder, particularly speaking of the Axis I diagnosis you have made, be affected by the ingestion of drugs and/or alcohol of a considerable quantity three to four hours prior to—

A I think it would be in—

Q (Continuing)—the incident

A (Continuing)—would increase the pathological behavior you find under the Axis II diagnosis, so Axis I, obviously if you ingest alcohol and you have been a sober alcoholic, you are no longer a sober alcoholic and you are going to drink a lot. . . .

Q *Assuming that Mr. Pirtle consumed drugs or alcohol, cocaine, possibly crystal meth, speed and alcohol within a three- to four-hour time frame prior to the incident,* do you have an opinion based upon a reasonable degree of medical certainty whether or not Mr. Pirtle lacked the ability to form premeditated intent to kill on May 17th, 1992?

A I have an opinion.

Q And what is that opinion?

A I don't think that at the time he was capable of premeditation, planned, organized act.

Q *And was that mental disorder affected by the consumption of those drugs and/or alcohol?*

A *Yes.*

(Emphasis added).

Similarly, another defense expert, clinical psychologist Dr. Karen Sheppard, testified on direct:

---

drugs is less criminal by reason of that condition. However, evidence of intoxication by alcohol or drugs may be considered in determining whether the defendant acted with intent or premeditated intent to kill.

The term intoxication refers to an impaired mental and bodily condition which may be produced either by alcohol, which is a drug, or by any other drug.

Washington's Diminished Capacity Instruction (not requested or given):

Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant has the capacity to form _____ [Fill in the requisite mental state (which here would be "the premeditated intent to kill the two victims")].

Q Doctor, you would agree basically, and isn't it your testimony, that the effect of drugs on people who abuse drugs is bad?

A Well, there are several things that you need to take into consideration. You are looking at the length for which they have been doing it and the type of chemical that they have ingested over time, *and in Mr. Pirtle's case, we are looking at intoxication, as well as long-term effects of his drug usage.*

(Emphasis added).

Dr. Phillip Murphy, another clinical psychologist hired by the defense, provided even more testimony regarding the effects of Pirtle's acute drug use on his mental condition at the time of the murders:

Q You have indicated that certain parts of the brain have a lower threshold for seizures than others.

A Uh-huh.

Q And you spoke of that when I asked you a question about drugs affecting the limbic system. Are there other factors that suggest or that appear to correlate between the proneness to a seizure or not?

A In general, when you have somebody with a seizure disorder, you want to make sure that they don't become excessively fatigued, that they don't become excessively stressed, *and that they stay off drugs and alcohol. Those are the three factors which are going to lower their seizure threshold.*

. . . .

Q If a person was on—if there was evidence that a person had used cocaine, methamphetamine, would that be the kind of drugs you refer to when you say there is a correlation?

A Yes, definitely.

. . . .

Q Now, what I want to ask you is, there is the factors and there is the sequence. What could trigger such a seizure?

A Okay, one—one, we would have to imagine that we've got some irritative focus, meaning based upon the neuropsychologicals that we are saying that he has a focal right hemisphere deficit. Now that's at a functional level. What that would translate to potentially is either a biochemical lesion, okay, which is one you may not be able to see, for example, like on an MRI or CAT scan, or an anatomical lesion which you could see on those. In cases similar to Mr. Pirtle's, I would predict that you probably would see some anatomic or biochemical lesion on either an MRI or a SPECT or something like that. *Given that irritative focus, then when it's assaulted, especially by stimulant drugs, it is going to increase the probability of those deficient and more epileptic-type cells kicking out at high discharge rates. Then you look at the factors of fatigue, stress, and the other effects of those drugs. . . . So those would be factors you would imagine as going to, you know, let the seizure occur, and that would be true with any type of seizure, but temporal lobe, certainly.*

(Emphasis added). Dr. Murphy offered his explanation of the relationship between Pirtle's acute drug use and the condition caused by chronic drug use at the time his crime spree was interrupted by a customer whose car triggered the drive-through signal inside the Burger King:

Then what occurs is that the car comes through the drive-through, signals whatever that device is and it's a sound—it's

a beep, okay? *Now, this man [Pirtle] at the time, because of the amount of stimulant drugs he is on, is extremely paranoid.* The beep again, temporal lobe, right temporal encoding, sets up even greater paranoia. That's when he rushes to get the female victim, okay, and then takes her out.

(Emphasis added). Dr. Murphy explained further on cross-examination, using a car as an analogy to Pirtle's brain, the effects the acute drug use had on Pirtle:

> With—in Mr. Pirtle's case there is no evidence of him having significant enduring frontal lobe problems. Okay? Except for to the right. *However, when he is under the influence of substances that wipe out his frontal lobe function, then you are looking at something more wrong than simply one stuck valve, because basically there is no gas in the tank or no oil in the engine.*

(Emphasis added). Dr. Jonathan Lipman, a neuropharmacologist[2] called by the defense, testified similarly, indicating that chronic use causes brain sensitivity to seizures, and thus "perverts" the normal symptoms of acute use into mental illness.

This defense expert testimony refutes the Court's conclusion that Pirtle was not intoxicated. The only reasonable conclusion when the record is viewed as a whole is that Pirtle was "impaired" and thus "intoxicated" at the time of the murders. Under *State v. Hansen,* 46 Wash.App. 292, 730 P.2d 706 (1986), *amended by* 737 P.2d 670 (Wash.Ct.App.1987), the determination to seek a voluntary intoxication instruction to match the defense expert testimony *mandates* a holding that counsel's performance was not deficient. In *Hansen,* the defendant suffered from a mental condition caused by chronic drug use, and was under the influence of drugs at the time of

the crime. 730 P.2d at 708. Rejecting a claim that the trial court erred by giving only a voluntary intoxication instruction, and not an additional diminished capacity instruction, for the jury's consideration of the defendant's asserted lack of capacity, the Washington Court of Appeals held:

> [W]e find that the instructions given by the trial court were sufficient to permit Hansen to argue, based on the evidence, his theory of the case. The court did not err, therefore, by refusing to give the additional instructions on diminished capacity that Hansen proposed.

*Id.* at 711.

The Court tries to distinguish the rule in *Hansen* on the ground that Pirtle was not intoxicated and concludes *Hansen* is a "very different case." But that ignores the extensive evidence the defense itself offered to explain Pirtle's behavior when he eliminated the two eye-witnesses to his robbery.

The Court notes that Pirtle said he was "coming down" from the drugs and that his sister testified similarly. Despite the testimony from *Pirtle's* experts who considered the amounts and types of drugs Pirtle ingested, and consistently concluded Pirtle's acute drug use affected him *at the time of the murders,* the Court nonetheless finds it reasonable to conclude Pirtle was not intoxicated. The Court ignores what common sense dictates: one can be "coming down" from drugs and still be "impaired" and thus "intoxicated." To assert otherwise imposes an unrealistic result: under the Court's logic once the effects of drugs have reached their height and begun to dissipate, one is now "coming down" and thus is no longer "intoxicated." I wonder how many DUI defendants have made the

---

**2.** According to Dr. Lipman, "[n]europharmacology is that expertise dealing with our understanding of the effects of drugs on the brain."

same argument to other juries and—not surprisingly—to no avail.

Nevertheless, the Court errs by resting its conclusion on two portions of testimony from Pirtle and his sister, thus discounting the in-depth testimony of *Pirtle's own experts,* not to mention a common sense interpretation of Pirtle's own testimony. The only reasonable conclusion from the *entire* record is that Pirtle was intoxicated, as defined in the jury instructions, at the time of the murders, and any seizure was at least in part caused by this intoxication. Pirtle's counsel cannot be said to have acted deficiently under Washington criminal defense standards by failing to request a diminished capacity instruction since, under *Hansen* and on this evidence, the voluntary intoxication instruction provided an adequate vehicle for guiding the jury's examination of the evidence. Indeed, examining the language of the two instructions set forth in footnote 1, *supra,* it is hard to see what difference inclusion of the other instruction would have made based on this record.

But assuming for the sake of argument that counsel erred by failing to seek a diminished capacity instruction, under the second *Strickland* prong there is no reasonable probability that this error affected the jury's verdict.

First, the jury received a total of twenty-one instructions, including an instruction that defined premeditation, another on intent, and one that allowed the jury to convict on the lesser crime of Second Degree Murder, which does not require proof of premeditation. When the instructions are viewed as a whole, it is apparent that had the jury accepted Pirtle's theory of the case, it could have found him guilty of Second Degree Murder instead of Aggravated First Degree Murder. Another in-

struction stating the jury could consider Pirtle's diminished capacity through some chemically induced "temporal or frontal lobe sensitivity" would have made no difference. Both sides presented this case to the jury responding to Pirtle's claimed lack of capacity to premeditate triggered by his drug use, both chronic and acute.

Second, even assuming that Washington's diminished capacity instruction somehow encompasses more on these facts than the voluntary intoxication instruction, to say that the missing instruction would have made a difference also ignores the prosecution's evidence, and Pirtle's own damaging admissions when he testified in his defense—testimony the jury obviously credited. The defense put on five experts saying Pirtle could not premeditate; the jury found that he did.

Pirtle testified to the following: on the morning of the murders he took a knife from his mother's kitchen and drove to a church next to the Burger King. He parked and staked out the restaurant for three to five minutes. He lay in wait for a male co-worker to depart, and then, in order to gain admittance, he pushed the buzzer and falsely told victim Tod Folsom that he was the recently departed employee. After tying up both of the victims on duty inside and robbing the restaurant, he had the presence of mind to answer the drive-through signal and tell the customer that the restaurant was not yet open. He then murdered the victims one at a time using another knife he obtained at the restaurant. He took several steps to immediately cover up the crimes, including hiding his soiled clothes in a neighbor's compost pile, leaving the car at a bus station, and then writing the chilling "Joe" letters from jail which contained lurid threats [3] against the lives of other Burger King employees.

---

3. Four months after his arrest, in an apparent attempt to implicate another person named

Pirtle's claim that he only intended to rob the Burger King for drug money was belied by his admission that on the morning of the crimes his mother had a sizable amount of money on hand at the house where he lived. · He also testified that of five fast food restaurants in the area, the Argonne Road Burger King was the only one where he would be recognized, and yet he did not wear a disguise. Pirtle also had a motive: he had been fired from his Burger King job for sexual harassment, and victim Dawnya Calbreath had been one of two women present to witness his termination.

The Court's conclusion, that Pirtle's actions are consistent with only an intent to rob and not an intent to kill, is puzzling. For instance, the Court recites Pirtle's explanation for why, after the robbery was complete, Pirtle went back to the freezer holding the victims. According to Pirtle, he brought Dawnya Calbreath out of the freezer in order to "intimidate" her into not telling the police that he robbed the store. Only then, after Calbreath grabbed his knife and Pirtle saw blood on her hand, did he "snap" and kill her.

What the jury obviously concluded in rejecting this analysis is why he would try to "intimidate" *only* Calbreath? Tod Folsom could identify Pirtle, yet Pirtle did not try to "intimidate" Folsom. In fact, after Pirtle knocked Calbreath unconscious and repeatedly slashed her throat, he went back to Folsom. Did he attack Folsom in a furious rage, indiscriminately stabbing him to death? No. By his own admission at trial Pirtle had the presence of mind to ask Folsom to take off his glasses, lay face down on the floor so Pirtle, as he instructed Folsom, could knock Folsom out. Once Folsom complied, Pirtle crushed his skull with a fire extinguisher, and then cut Folsom's throat. As 'was obvious to the jury by its verdict, these facts are entirely consistent with a premeditated intent to kill.

As if this were not enough, the jury heard Pirtle describe in his own words how, after slashing both victims, he "heard Dawnya's body making noises" and went back to cut her throat some more, nearly decapitating her. "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quotation marks and citation omitted). In view of these facts, I respectfully disagree with the Court's conclusion that, had there been a diminished capacity instruction given as well, there is a reasonable probability that the jury's verdict might have been different. There was no prejudice under *Strickland*.

## III

The voluntary intoxication instruction was sufficient to guide the jury in evaluat-

---

"Joe" as the person responsible for the murders, Pirtle sent letters ostensibly from "Joe" to other Burger King employees. The following is an excerpt from one of these letters read to the jury:

> My hands are the ones that took the lives of these two worthless employees there. Just so you don't think this is some kind of bullshit, here are some things you can check out that only I could know. Check and see if they ever located the male victim's wristwatch and ask if his glasses were broken or not, or how close the fucking

female's head was from being completely cut off.... I really loved taking those two lives that day.
> . . . .
> You see, Phil, I love to take human life. It is so fucking easy to viciously kill people for me and it makes me want to come all over myself.

The jury was certainly entitled to weigh this revolting evidence in concluding that Pirtle formed the premeditated intent to kill his victims during the robbery.

ing the defense theory regarding lack of premeditation. Moreover, in light of the totality of the record before us, Pirtle cannot establish that his counsel's failure to request a diminished capacity instruction amounted to prejudice "so serious as to deprive [him] of a fair trial...." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Because the jury obviously considered Pirtle's theory that due to his drug use he could not premeditate, and rejected it based on ample evidence showing premeditated intent to kill, I respectfully dissent from the Court's decision approving issuance of the writ.